**1398**

DEFENSE LANGUAGE INSTITUTE,
Presidio of Monterey, California,
Petitioners,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent,

National Federation of Federal Employees, Intervenor-Respondent.

FEDERAL LABOR RELATIONS
AUTHORITY, Petitioner,

v.

DEFENSE LANGUAGE INSTITUTE,
Presidio of Monterey, California,
Respondent.

Nos. 84–7498, 84–7610.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 1985.

Decided Aug. 8, 1985.

Frederic Freilicher, Dept. of Justice, Washington, D.C., for Defense Language Institute.

Robert J. Englehart, Washington, D.C., for Federal Labor Relations Authority.

Before SNEED, TANG and CANBY, Circuit Judges.

SNEED, Circuit Judge:

Defense Language Institute (the Institute) petitions for review of a decision and order by the Federal Labor Relations Authority (the Authority) holding that a proposal by the National Federation of Federal Employees (the union) comes within the Institute's statutory duty to bargain. The proposal would require the Institute to correct all in-house cost estimate data, compiled to determine the comparative cost of assigning work to federal employees or contracting out to the private sector, which the union demonstrates is either invalid or not prepared in accordance with existing directives. The Authority cross-appeals for enforcement of its order, and the union intervenes on the Authority's behalf. Because the proposal improperly affects the

authority reserved to management under 5 U.S.C. § 7106(a)(2)(B), we decline to enforce the Authority's order.[1]

## I.

## STATUTORY BACKGROUND

Title VII of the Civil Service Reform act of 1978, 5 U.S.C. § 7101–7135 (1982), establishes a collective bargaining system to govern labor-management relations in the federal sector. Federal agencies and employee unions share a duty to bargain in good faith over "conditions of employment." *Id.* § 7103(a)(12). The Act broadly defines "conditions of employment" to include "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions...." *Id.* § 7103(a)(14).

This duty to bargain is not without limit. Certain prerogatives are reserved to management. *See id.* § 7106(a). In particular, management has the authority "to make determinations with respect to contracting out." *Id.* § 7106(a)(2)(B). But the *procedures* observed by management in exercising its reserved authority are subject to negotiation. *Id.* § 7106(b)(2).[2]

## II.

## FACTS AND PROCEEDINGS BELOW

Except for functions that are "inherently Governmental in nature," the stated policy of the federal government is to rely on private enterprise to supply its needs, if doing so is cost-effective. OMB Circular A–76 (the Circular), 48 Fed.Reg. 37, 110 (1983). This policy requires the Institute to conduct comparative cost analyses to determine whether it should obtain necessary goods and services from the private sector or "in-house" from government personnel. A Cost Comparison Handbook supplements the Circular and outlines procedures to be followed in making this determination.

In August 1982, the Institute and the union signed a collective bargaining agreement. The agreement contained a provision concerning the contracting out of Institute work:

> Subsequent to opening of the bid and before a contract is awarded, the Union shall be provided all data concerning the "in-house" estimate of cost of the work to be performed. The Union will be given ten (10) workdays, which may be extended upon request, to review the "in-house" estimate and other pertinent data and to comment on and/or challenge the validity of the data. *All data will be corrected where the union demonstrates that it is not valid or prepared in accordance with existing directives.*

(emphasis added). The parties' dispute concerns the underscored portion of the provision.

The Army's Training and Doctrine Command reviewed the agreement and determined that the portion of the proposal requiring the correction of invalid or improperly prepared data was non-negotiable because it interfered with management's reserved authority to make determinations to contract out. *See* 5 U.S.C. § 7114(c) (agreements are subject to approval by the

---

1. The Authority had jurisdiction to determine whether the Institute's duty to bargain embraced the disputed proposal under 5 U.S.C. § 7117(c). This court has jurisdiction over the Institute's timely petition for review and the Authority's cross-petition for enforcement under 5 U.S.C. § 7123(a)–(b).

2. In pertinent part, section 7106 provides:
   (a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—
   ....
   (2) in accordance with applicable laws—

....
   (B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;
   ....
   (b) Nothing in this section shall preclude any agency and any labor organization from negotiating—
   ....
   (2) procedures which management officials of the agency will observe in exercising any authority under this section....
5 U.S.C. § 7106(a)(2)(B), (b)(2).

head of the agency). The union petitioned the Authority to review the disapproval. *See id.* § 7117(c). The Authority ruled in favor of the union, finding that the proposal was not inconsistent with the Institute's reserved right to make determinations concerning contracting out and that the proposal did not conflict with the procedures established in the Circular. *See National Federation of Federal Employees, Local 1263 and Defense Language Institute,* 14 FLRA No. 101, at 3–4 (1984). This appeal followed.

## III.

## DISCUSSION

The parties' dispute centers on the relationship between sections 7106(a) and 7106(b) of Title VII of the Civil Service Reform Act, 5 U.S.C. § 7106(a)–(b). The substantive rights reserved to management under section 7106(a) are not negotiable, but the procedures by which that authority is exercised are subject to negotiation. *EEOC v. FLRA,* 744 F.2d 842, 845 (D.C.Cir. 1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 3497, 87 L.Ed.2d 629 (1985); *Department of Defense v. FLRA,* 659 F.2d 1140, 1151–52 (D.C.Cir.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). This statutory structure, when projected against the deeply rooted legal distinction between substance and proce-

dure with which we are all familiar, suggests that the issue before us is whether the challenged provision is substantive or procedural. This formulation is misleading, however. The true issue is whether the challenged provision constitutes, within the meaning of 5 U.S.C. § 7106(b)(2), "procedures which management officials of the agency will observe in exercising any authority under this section." "Authority" exercisable under 5 U.S.C. § 7106 includes the right "to make determinations with respect to contracting out." 5 U.S.C. § 7106(a)(2)(B). Our task is to interpret section 7106 so as to give each part its proper meaning.

The Authority maintains that the challenged provision imposes no particular limitation on management's right to make contracting-out determinations. Rather, it merely concerns procedures that management will observe in exercising its authority to contract out. Management may use only valid data prepared in compliance with existing external limitations on its discretion, including the Circular.[3] *See National Federation of Federal Employees, Local 1263 and Defense Language Institute,* 14 FLRA No. 101, at 3 (1984). The Authority concludes, in effect, that the challenged proposal constitutes a "procedure" within the meaning of section 7106(b)(2) and as such is subject to negotiation.[4]

---

3. In past decisions, the Authority has applied two distinct tests to classify proposals as concerning negotiable procedures under section 7106(b) or nonnegotiable substantive rights under section 7106(a). Proposals which "stand close to the uncertain border between procedure and substance" are nonnegotiable if their adoption would "directly interfere" with management's reserved rights. *Department of Defense v. FLRA,* 659 F.2d 1140, 1159 (D.C.Cir. 1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982); *accord Navy Pub. Works Center v. FLRA,* 678 F.2d 97, 100 n. 3 (9th Cir.1982). Such proposals, while cast in procedural language, specify substantive criteria to govern decisions protected by section 7106(a). *Department of Defense,* 659 F.2d at 1152. Alternatively, more pristinely procedural proposals are negotiable unless implementation would prevent management from "acting at all." *Id.* at 1153; *accord Navy Pub. Works Center,* 678 F.2d at 100 n. 3. The Authority offers no explanation for why it declined to apply either test and

opted instead to focus on the degree of discretion retained by the agency. We note that the Authority finds some support in recent case law. *See EEOC v. FLRA,* 744 F.2d at 848 n. 12. But we do not reach the issue because we conclude that the union's proposal fails under all three formulations.

4. The Authority relies primarily on a recent decision of the District of Columbia Circuit upholding the Authority's determination that a proposal requiring management to comply with the Circular and other applicable laws concerning contracting out was bargainable. *See EEOC v. FLRA,* 744 F.2d at 842. The court reasoned that the proposal did not define any substantive criteria guiding the contracting-out decision, but rather "echoe[d] the statutory requirement that contracting-out determinations be made in accordance with applicable laws"; the proposal therefore did not trench upon management's reserved rights under section 7106. *See id.* at

In rendering its negotiability ruling, the Authority "exercise[d] its 'special function of applying the general provisions of the Act to the complexities' of federal labor relations." *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963)). Its determination therefore deserves considerable deference. *Id.* But we cannot rubber-stamp a decision that fails to give a proper construction of a pertinent statute or that frustrates an underlying congressional policy. *Id.* We believe this case requires that we invoke this deference-limiting principle.

Title VII of the Civil Service Reform Act reflects an accommodation of twin policies. Undeniably, Congress intended to expand "the statutory protection of the right of [federal] employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them." 5 U.S.C. § 7101(a)(1) (statement of findings and purpose). At the same time, however, Congress strove to preserve the ability of the federal government to operate in an efficient and effective manner.[5] Indeed, the very terms of the Act require interpretation of its provisions "in a manner consistent with the requirement of an effective and efficient Government." *Id.* § 7101(b).

The Authority's interpretation does not do this. It subjects all contracting-out determinations to the grievance mechanism provided by the Act, to arbitral review, and—ultimately—to review by the Authority. Judicial review thereafter may be unavailable. *See EEOC v. FLRA*, 744 F.2d at 860 n. 17 (MacKinnon, J., dissenting). If adopted as a result of negotiation, the union's proposal would allow review by an arbitrator and by the Authority of the data underlying management's "in-house" cost estimate for compliance with the Circular. But because the Circular lacks meaningful standards to guide management's discretion, the Authority's review would confront the same difficulty that has led courts to hold that judicial review of an agency's contracting-out determination and of the underlying studies and cost estimates is unavailable. *See, e.g., AFGE, Local 2017 v. Brown*, 680 F.2d 722 (11th Cir.1982), *cert. denied*, 459 U.S. 1104, 103 S.Ct. 728, 74 L.Ed.2d 952 (1983); *Local 2855, AFGE v. United States*, 602 F.2d 574, 580–83 (3d Cir.1979).

Determining the most efficient configuration of government employees and resources or determining whether certain expenses are legitimate costs of an in-house operation inevitably involve " 'questions of judgment requiring close analysis and nice choices' " which are properly committed to the informed discretion of management. *See AGFE, Local 2017 v. Brown*, 680 F.2d at 727 (quoting *Panama Canal Co. v. Grace Line, Inc.*, 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1958)). The Circular's lack of definite guidelines to shape the exercise of this discretion will result in arbitral review in which the arbitrator can substitute his judgment for that of the agency. This second judgment, in turn, may be set aside in favor of that of the Authority. The potential for long delays is obvious. More than delay is involved, however. *See Department of Defense*, 659 F.2d at 1153–58 (rejecting contention that proposals resulting in delay infringe management's reserved rights). The operative effect of the union's proposal is to divest management of the essence of its statutory authority to contract out. Un-

---

848. We respectfully refrain from adopting the reasoning employed in that case.

**5.** Statements stressing the importance of promoting governmental efficiency appeared in both the House and Senate reports and during floor debate. *See* H.R.Rep. No. 1403, 95th Cong., 2d Sess. 3 (1978), *reprinted in* House of Representatives Comm. on Post Office and Civil Serv., Legislative History of the Civil Service Reform Act of 1978, at 640 (Comm.Print 1979) [hereinafter cited as *Legislative History*]; S.Rep. 969, 95th Cong., 2d Sess. 2–4, U.S.Code Cong. & Admin.News 1978, pp. 2723, 2724, *reprinted in Legislative History, supra*, at 1466–68; 124 Cong. Rec. 29,187 (remarks of Representative Clay); 124 Cong.Rec. 33, 389 (remarks of Senator Percy).

der its view, the powers of management become a very small pit of a very large piece of fruit, the succulent part of which is "procedures" to be observed by management. We therefore reject the Authority's contention that the proposal "imposes no particular limitation on management's right to make contracting-out determinations."

The Authority, relying again on *EEOC v. FLRA*, asserts that the Act would allow grievances alleging errors in management's cost estimate data even in the absence of a specific provision in the collective bargaining agreement. *See* 744 F.2d at 849–51. "Grievance," the Authority asserts, is defined expansively to include "any claimed violation, interpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. § 7103(a)(9)(C)(ii). Moreover, the Act expressly excludes only five subjects from the grievance mechanism's coverage.[6] This broad definition, the Authority maintains, embraces grievances challenging management's comparative cost analysis. We reject this contention for two reasons.

 First, we find it incredible that the parties would so strenuously dispute a pro-

posal that gives the union nothing it did not already possess and deprives management of nothing it had not already lost. Second, and more important, the express language of 5 U.S.C. § 7106 contradicts the Authority's position. Section 7106 provides that, except for 7106(b), *"nothing in this chapter shall affect* the authority of any management official of any agency ... in accordance with applicable laws ... to make determinations with respect to contracting out." *Id.* § 7106(a)(2)(B) (emphasis added). By its terms, this proscription applies to the Act's grievance mechanism.[7] *EEOC v. FLRA*, 744 F.2d at 857 (MacKinnon, J., dissenting). Having decided that the union's proposal violates rights reserved to management under section 7106(a), our inquiry is at an end.[8]

We deny the Authority's request to enforce its order.

DENIED.

**6.** Expressly excluded is:
    (1) any claimed violation of subchapter III of chapter 73 of this title (relating to prohibited political activities);
    (2) retirement, life insurance, or health insurance;
    (3) a suspension or removal under section 7532 of this title;
    (4) any examination, certification, or appointment; or
    (5) the classification of any position which does not result in the reduction in grade or pay of an employee.
5 U.S.C. § 7121(c).

**7.** In *EEOC v. FLRA,* the court rejected the agency's contention that a proposal requiring compliance with the terms of the Circular would render contracting-out determinations "the prerogative not of management but of the arbitrator." *See* 744 F.2d at 849–51. The court reasoned that the Act's grievance mechanism would cover complaints that management failed to make contracting-out determinations "in accordance with applicable law," as required by section 7106(a)(2). *Id.* Such complaints would be grievable even in the absence of the contract proposal. *Id.* at 849.

In effect, the *EEOC* court construed the phrase "applicable law" to include the Act's

grievance provisions. *Id.* at 857 (MacKinnon, J., dissenting). It may be that Congress intended to shield management's reserved rights from bargaining but not from the grievance mechanism and ultimate review through arbitration. But we agree with the dissent that, had Congress intended contracting-out decisions to be grievable, it was "singularly inept" in articulating its purpose. *See id.* (MacKinnon, J., dissenting). Congress did *not* say that management's reserved rights are *nonnegotiable;* it said, *"nothing in this chapter shall affect"* the right of the agency to make contracting-out decisions. We decline to depart from the express language of the statute.

**8.** We do not reach the Institute's alternate contention that the proposal is not bargainable because it "extend[s] to matters which are the subject of a Government-wide rule or regulation." *See* 5 U.S.C. § 7117(a)(1). Nor do we address the issue whether contracting out affects "conditions of employment." If it does not, the expansive language relied on by the Authority falls short of the reach attributed to it. *See EEOC v. FLRA,* 744 F.2d at 857–59 (MacKinnon, J., dissenting).